| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | FOR THE DISTRICT OF CONNECTICUT |
| 2 | |

- - - - - - - - - - - - - - - - x

```
 3
    EDWARD KRAMER,                    :  No. 3:15-cv-01230(SRU)
 4                    Plaintiff,      :  915 Lafayette Boulevard
              vs.                     :  Bridgeport, Connecticut
 5                                    :
    ANTONIO VITTI, ET AL,             :  July 13, 2017
 6                                    :
                    Defendants.       :
 7
```

- - - - - - - - - - - - - - - - x

```
 8

 9                           MOTION HEARING

10  B E F O R E:

11       THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

12
    A P P E A R A N C E S:
13
         FOR THE PLAINTIFF:
14
               LAW OFFICES OF WILLIAM SYLVESTER PALMIERI
15                   129 Church Street
                     Suite 405
16                   New Haven, Connecticut  06510
               BY:  WILLIAM SYLVESTER PALMIERI, ESQ.
17

18       FOR THE DEFENDANTS:

19               KARSTEN & TALLBERG LLC
                     500 Enterprise Drive
20                   Suite 4B
                     Rocky Hill, Connecticut  06067
21               BY:  PATRICK D. ALLEN, ESQ.

22

23                   Sharon L. Masse, RMR, CRR
                     Official Court Reporter
24                   915 Lafayette Boulevard
                 Bridgeport, Connecticut  06604
25                   Tel: (860)937-4177
```

1                    (Proceedings commenced at 2:02 p.m.)

2              THE COURT:  Good afternoon.

3              MR. PALMIERI:  Good afternoon.

4              MR. ALLEN:  Good afternoon.

5              THE COURT:  We're here in the matter of Kramer

6      vs. Vitti.  Could I have appearances, please.

7              MR. PALMIERI:  Yes.  Good afternoon, Your Honor.

8      William S. Palmieri for Edward Kramer, the plaintiff.

9              THE COURT:  Thank you.

10             MR. ALLEN:  Good afternoon, Your Honor.  Patrick

11     Allen for Defendants Vitti and Staurovsky, and to my left

12     is Kimberly Bossi, a legal clerk summering with our firm,

13     who is here to observe, if Your Honor has no objection to

14     that.

15             THE COURT:  That's fine.  Is she handling the

16     argument?

17             MR. ALLEN:  I wish.  I tried, but she insisted

18     that I do it, so --

19             THE COURT:  All right, very well.  We're here,

20     obviously, on the motion for summary judgment, which I've

21     reviewed.

22             So let me start out by kind of identifying we

23     have two defendants left.  We have a single cause of

24     action, although it's brought under both the federal and

25     state counterparts; but essentially we've got to figure

1   out which of the following four elements of a claim for

2   malicious prosecution there are issues of fact that need

3   to be decided by a jury.  I don't think there's any

4   dispute that the defendants initiated or procured criminal

5   proceedings.  There is, obviously, a dispute about whether

6   the proceedings terminated in favor of the plaintiff,

7   whether the defendants acted with or without probable

8   cause and whether they acted with malice, and if we get

9   through those, there's also a separate question of whether

10  they are entitled to qualified immunity.  So that's how I

11  see it, and I hope that covers the waterfront.

12          Mr. Palmieri, with kind of that introduction in

13  mind, it seems to me we ought to kind of take these

14  elements up one at a time.  It looks to me like the

15  question on Element 2, terminating in favor of the

16  plaintiff, there's no dispute that the charges were

17  nolled, and a nolle can either be favorable or not

18  depending on the circumstances.  Here the argument is that

19  the nolle was not entered under circumstances suggesting

20  the plaintiff's innocence.  So how do you respond to that

21  and what is the argument that the nolle was, in fact, a

22  favorable termination?

23          MR. PALMIERI:  Absolutely.  That term which Your

24  Honor just mentioned about indicative of innocence has a

25  very narrow reading in the case law that we've briefed in

1    our objection, and that narrow construction by our courts

2    is whether the defendant did something to procure the

3    nolle, that is, the criminal defendant in the action did

4    something to procure the nolle, either requested the nolle

5    or in the cases we've cited did something to absent

6    himself intentionally from the jurisdiction, like flee

7    from the jurisdiction, or to engage in fraud, or to, as

8    the Connecticut state law cases talk about, do something

9    like stipulate to probable cause, or to do anything so

10   minor as engage in taking a program or paying a fine or

11   anything of that nature.  None of that occurred in this

12   particular case.  And so the indicative of innocence has a

13   strict construction under the law, which the case I've

14   cited does articulate, and that is that -- and even the

15   defendants in this case say that if the defendant requests

16   or gives something of value for the nolle, then that shows

17   that there's a failure to meet that favorable termination.

18   None of that is present in this case.

19          What the prosecutor did in this case was say,

20   Hey, he's got a bigger problem somewhere else, and we're

21   not going to pursue this.

22          THE COURT:  Right.  So --

23          MR. PALMIERI:  The prosecutor can say anything

24   that she or he wishes, in this case he.  He could say, I

25   had a vision from on high that I should -- you know, that

1  I should not do this, or, In my opinion the person is

2  guilty --

3        THE COURT:  Well, they don't frequently say, I

4  had a vision from on high, but they do very frequently

5  say, We're going to, in effect, defer to the more serious

6  charges in parallel proceedings.

7        MR. PALMIERI:  Absolutely.

8        THE COURT:  It happens all the time.

9        MR. PALMIERI:  And that is specifically not

10  something that is tantamount to saying -- I'm saying a

11  double negative.  That specifically does not indicate an

12  unfavorable termination because --

13        THE COURT:  Well, why shouldn't it, because

14  every week I sentence people who have had their state

15  charges nolled --

16        MR. PALMIERI:  Right.

17        THE COURT:  -- in favor of the federal

18  prosecution, and they have pled guilty, as your client did

19  in Georgia, they have pled guilty in federal court, and

20  the idea that they would be allowed to sue an arresting

21  officer, having pled guilty, because the prosecutor was

22  willing to defer to another prosecution --

23        MR. PALMIERI:  You're reading facts into this,

24  Judge.  He pled guilty to something I think years after

25  this was resolved.  He -- the evidence --

1          THE COURT:  He pled guilty.  He was extradited.

2          MR. PALMIERI:  Right, and the evidence in the

3     case was that he fought that extradition.

4          THE COURT:  Yes, he did.  It went to the

5     Appellate Court, and we have a decision, a written

6     decision from the Appellate Court.

7          MR. PALMIERI:  In part an assertion of his

8     innocence.

9          THE COURT:  An assertion that the charges were

10    not pending against him, which was rejected by that Court.

11    So he is then extradited on those charges, and he pled

12    guilty to those charges.  Those charges were more serious.

13    They were similar in nature but more serious than the

14    charges pending --

15         MR. PALMIERI:  There is no connection between a

16    risk of injury that had no probable cause, risk of injury

17    arrest in Connecticut that had no probable cause and a

18    crime that had occurred -- at this point of the time of

19    the nolle, allegedly, it was only an accusation it was a

20    crime -- had allegedly occurred ten years prior in a

21    different state, a different crime.  So --

22         THE COURT:  I'm not saying that there's a --

23    that they are related.  This is not a continuing course of

24    conduct.  The point --

25         MR. PALMIERI:  Well, that's what concerned me,

1    Judge, because when you bring up that --

2            THE COURT:  The point is it's similar.  It was

3    child molestation in Georgia, and it was risk of injury to

4    a child in Connecticut.

5            Now, it makes no sense from a policy point of

6    view when a Connecticut prosecutor says, Hey, we're going

7    to drop this prosecution because he's heading off to face

8    felony charges of a similar nature in another state, it

9    makes no sense to allow him now to sue --

10           MR. PALMIERI:  He was faced -- he was extradited

11   for and the allegation was that he had violated terms and

12   conditions of release.  So that didn't occur until after

13   this arrest.  And what he was extradited for was, you

14   know, for that purpose, and then he was brought down there

15   and fought that down there as well.  That's irrelevant.

16           I think what Your Honor is conflating here is

17   when there is an arrest, say if there was a place engaged

18   in fencing stolen goods, and there was a joint operation

19   between the city police officers, municipal police

20   officers and federal agents --

21           THE COURT:  All right --

22           MR. PALMIERI:  -- and there were arrests that

23   occurred simultaneously on the same bases --

24           THE COURT:  Let me just read to you from the

25   Appellate Court decision one of the issues that he raised

1   in the extradition proceeding:  "that regardless of the

2   factual sufficiency of the requisition documents" -- that

3   was the documents for his extradition -- "he is not a

4   fugitive from Georgia because any once-pending charges

5   against him in that state have effectively been

6   dismissed."  That proposition that he didn't have pending

7   charges in Georgia was rejected by the Appellate Court of

8   Connecticut.  So the idea that he was extradited for

9   violating a condition of his release is unsubstantiated by

10   the record.

11          MR. PALMIERI:  That's the Appellate Court's

12   opinion as to what the status of the Georgia case was,

13   Connecticut Appellate Court's.  It doesn't bear in any way

14   upon what the probative standard in this case is.  I'm

15   reading from the defendants' brief.  They cite *Frey v.*

16   *Maloney*, which is a Connecticut -- Federal Connecticut

17   case, 476 F. Supp. 2d 141 at 148 which says:  To satisfy

18   this element of the claim, plaintiffs must prove, at a

19   minimum, that the criminal charges against him were

20   discharged without a trial under circumstances amounting

21   to the abandonment of the prosecution without request by

22   him or arrangement with him.

23          So now clearly this standard is not met here.

24   Mr. Kramer, as Your Honor just pointed out, fought tooth

25   and nail to avoid the extradition to the point where he

1   filed a habeas, had a habeas trial and then appealed it to

2   our Appellate Court.  Clearly he was not requesting or

3   arranging --

4               THE COURT:  My point is this.  I think that

5   standard does not contemplate what we have here.  What we

6   have here is a decision by a prosecutor who says, It is

7   not worth the trouble to continue to prosecute him on a

8   minor charge when another jurisdiction is prosecuting him

9   on a similar, much more serious charge.

10              MR. PALMIERI:  That happens all the time.

11              THE COURT:  That's my point.  That's my point.

12  It happens all the time --

13              MR. PALMIERI:  It's not sufficient.

14              THE COURT:  -- and people should not be allowed

15  to sue officers who arrested them simply because a

16  prosecutor decides, I'm going to defer to the more serious

17  charges pending somewhere else.

18              MR. PALMIERI:  Well, with all due respect,

19  Judge, I respect your opinion, but that's not what the law

20  says.

21              THE COURT:  Well, no, but on appeal, when I hold

22  that that's the standard, should be the standard, we'll

23  have some law as to whether I'm right or wrong.

24              MR. PALMIERI:  That may be the way this goes.

25              THE COURT:  Because it makes no sense to require

1    a prosecutor, who has valid charges, to continue a

2    prosecution at some expense to the state when that person

3    is going to arguably be in prison on a much more serious

4    charge at the time that they're trying to prosecute them.

5              MR. PALMIERI:  Well, you know, I think that Your

6    Honor is kind of taking other experiences and adding it to

7    this, and I think Your Honor is also recognizing that what

8    you're opining here is not the state of the law.  The

9    state of the law is that it has to be requested by the

10   defendant, made with the defendant's arrangement.

11             THE COURT:  The state of the law is it has to be

12   nolled under circumstances suggesting innocence, and

13   deferring to more serious charges elsewhere does not in

14   any way suggest the innocence of the person who has had

15   the charges nolled.

16             MR. PALMIERI:  I'm going to read from -- and it

17   is briefed, but *Spak*, which is the case that we're talking

18   about, *Spak v. Washington*, 127 F.3d at 557 --

19             THE COURT:  Right.

20             MR. PALMIERI:  -- talking about the

21   circumstances that are indicative of a defendant's

22   innocence, as you're talking about.  It says:  "However,

23   this qualifier is defined narrowly.  It generally only

24   includes nolles that are caused by the defendant, either

25   by his fleeing the jurisdiction to make himself

1    unavailable for trial" -- not the case here -- "or

2    delaying a trial by means of fraud" -- also not the case.

3    "It also includes any nolle entered in exchange for

4    consideration offered by the defendant, e.g.,

5    cooperation," also not the case.

6              THE COURT:  Why is the defense not correct when

7    they argue that the *Spak* standard is met here because the

8    defendant, your client, the plaintiff in this case, caused

9    his nolle by his conduct giving rise to the more serious

10   charges in Georgia?  The idea that the only way he can

11   cause it is to escape seems pretty limited.  Here he's

12   caused the nolle.

13             MR. PALMIERI:  That's not what I'm arguing, that

14   the only point is that he escaped, and it's not what the

15   state or the federal law says.  It's that he gave

16   something of value for it, or he requested it, or he

17   engaged in fraud to make himself unavailable for

18   prosecution, among other things --

19             THE COURT:  The *Spak* court --

20             MR. PALMIERI:  -- none of which apply to this

21   case.

22             THE COURT:  The *Spak* court observed that nolles

23   that are, quote, caused by the defendant, unquote,

24   including, quote, his fleeing the jurisdiction to make

25   himself unavailable for trial or delaying a trial by means

1     of fraud, unquote, as well as any exchange of

2     consideration, do not bespeak innocence.

3            Here the argument of the defense, as I

4     understand it, is the standard is met; that is, he has

5     made himself unavailable for trial or delaying trial

6     because he has done something that has caused him to be

7     prosecuted on more serious charges in another

8     jurisdiction.

9            MR. PALMIERI:  The facts are against you on

10    that, Judge.

11           THE COURT:  Do you have a case that says what

12    I'm suggesting, in fact, is not the proper interpretation

13    of *Spak*?

14           MR. PALMIERI:  There is no case that says what

15    is an incorrect reading of a case --

16           THE COURT:  No.  This --

17           MR. PALMIERI:  -- is correct.

18           THE COURT:  This circumstance comes up all the

19    time, so presumably you have a case that says, Judge,

20    you're wrong; it's been held in the Second Circuit that if

21    you defer to other more serious charges in another

22    jurisdiction, that's a favorable termination for the

23    person who had to face the more serious but not the less

24    serious charges.

25           MR. PALMIERI:  Those are not facts in this case,

1   Judge.

2             THE COURT:  How so?

3             MR. PALMIERI:  The defendant made -- the

4   criminal defendant, who is the plaintiff in this case,

5   made efforts to remain in Connecticut.  It was the

6   prosecutor's choice to not pursue the case.

7             THE COURT:  It's the conduct that gave rise to

8   the charges in Georgia that is the conduct --

9             MR. PALMIERI:  Well, that's different.

10  That's -- you're kind of changing -- with all due respect,

11  you're changing --

12            THE COURT:  No.

13            MR. PALMIERI:  -- the rules as we go.

14            THE COURT:  No.  The fact -- sir, sir, the fact

15  that you didn't hear or understand what I said because

16  you're talking over me doesn't mean I'm changing it.  What

17  I'm suggesting to you is his conduct is the reason he was

18  unavailable for trial.  There's nothing to suggest that

19  because a prosecutor says, We're going to let this more

20  serious charge go forward in another jurisdiction, or even

21  the same jurisdiction --

22            MR. PALMIERI:  That would mean that anyone --

23  everyone accused of a crime, accused of a crime anywhere,

24  and then subsequently arrested ten years later in a

25  different state, on an unrelated crime, would have no

```
 1   right to sue for a false arrest, if what you're saying

 2   were the law.  That's -- that's ridiculous law.

 3            THE COURT:  It's not ridiculous because the

 4   ten-year-old case was still pending as a result of his

 5   actions.  So the only reason it's ten years old is because

 6   he delayed the prosecution.

 7            MR. PALMIERI:  That's not correct.

 8            THE COURT:  Yes, it is correct.  It's undisputed

 9   that he got out of the Georgia trial by claiming he was

10   medically unable to go forward.

11            MR. PALMIERI:  He was medically unable to go

12   forward and the order of --

13            THE COURT:  Despite the fact he's able to travel

14   to Connecticut --

15            MR. PALMIERI:  The order of the Court that's on

16   the record, that is presented by the defendants on the

17   record, is that that case would not be reinstated in

18   Georgia unless and until the plaintiff made a motion to do

19   so.

20            THE COURT:  Precisely.

21            MR. PALMIERI:  The defendant in that case.

22            THE COURT:  So it's within his control to have

23   this case heard or not heard for the last ten years, and

24   he decided to have it not heard.  So he's the one who

25   caused the ten-year delay, he's the one who undertook the
```

1    actions that caused the parallel prosecution, and he can't

2    benefit from a decision by a prosecutor here to --

3              MR. PALMIERI:  But even the Appellate Court

4    disagrees with you that it was he that did this.  What

5    they said --

6              THE COURT:  Show me where in the Appellate Court

7    decision.

8              MR. PALMIERI:  They agreed with the habeas court

9    which adopted the testimony of Daniel Porter, the

10   out-of-state Georgia prosecutor, that the case was

11   pending.  Mr. Kramer had argued that that case was no

12   longer pending because they violated a law in Georgia that

13   after a certain time, the case would no longer have

14   viability due to the terms.

15             THE COURT:  I'll read you the finding --

16             MR. PALMIERI:  And that was rejected.

17             THE COURT:  I'll read you the finding from the

18   Appellate Court quoting the Superior Court in the

19   extradition matter, quote:  There is no indication or even

20   a suggestion that the Georgia district attorney's office

21   ever expressed an intention not to proceed with the

22   prosecution of the petitioner, unquote.

23             How is it that that proposition supports the

24   factual statement you just made?

25             MR. PALMIERI:  In fact, that's exactly what I

1   just said, that our Appellate Court found that there was

2   no efforts on the part of the defendant, then the criminal

3   defendant, that whatever he was saying for the purposes

4   that we're talking about right here was that he had done

5   something to delay -- that Your Honor is saying his

6   actions made that case suspend.  Our Appellate Court is

7   saying, No, that's not the case.  That was my point.

8               THE COURT:  All right, here we go.  Let's try

9   this then.

10              MR. PALMIERI:  I mean --

11              THE COURT:  His contention --

12              MR. PALMIERI:  -- it seems that Your Honor is

13  trying to find --

14              THE COURT:  His contention --

15              MR. PALMIERI:  -- things to prove --

16              THE COURT:  His contention, sir, was, quote:

17  That the demanding State of Georgia has surrendered to him

18  all control over the future prosecution of this case by

19  ordering the indefinite continuation of his trial until

20  such time as he moves the Court to commence the trial

21  based upon proof that he will be physically capable of

22  getting through it despite his difficult medical

23  condition.  The habeas court rejected this claim, unquote.

24              So how is it that --

25              MR. PALMIERI:  That's what he said.

1          THE COURT:  How is it the habeas court supported

2    that claim?

3          MR. PALMIERI:  No, I'm saying that was the

4    argument that he raised.  Your Honor had said that by his

5    actions he was delaying the trial, which, first of all, I

6    don't think have any bearing on this different arrest ten

7    years later in a different state, but for the purposes of

8    responding to your question, I'm doing so.  The habeas

9    court rejected that.  The Appellate Court upheld that

10   rejection, which is the point I was trying to make.  Your

11   Honor was saying that he was -- Mr. Kramer was acting to

12   delay the action.  Both the appellate and habeas courts

13   rejected that contention.

14         THE COURT:  Neither court ruled upon that

15   contention.  What they said was they rejected that he was

16   allowed, that he had -- that he had control over the case.

17   That's what they rejected.  They didn't reject his view

18   that --

19         MR. PALMIERI:  He didn't have control over the

20   case.  And if he didn't have control of the case, then

21   what you're saying is --

22         THE COURT:  We're getting way off track.  We're

23   getting way off track.

24         MR. PALMIERI:  I agree.

25         THE COURT:  As a public policy matter, it has to

1  be the law that when a prosecutor drops charges in

2  preference or in deference to other more serious charges,

3  that that has to constitute a termination that is not

4  consistent with innocence because otherwise we will never

5  get prosecutions dropped.  There will be warrants waiting

6  for everybody when they get out of prison, and we'll be

7  trying stale cases all over the country in order to avoid

8  civil actions based upon the idea that there was a

9  malicious prosecution.

10          MR. PALMIERI:  Just so I'm perfectly clear,

11  Judge, and this is respectfully because I'm sure we're

12  going to have appellate argument on this, this is your

13  opinion as an extension of the law but not based upon a

14  case that says what Your Honor is asserting.

15          THE COURT:  I don't have a case that says it,

16  and you don't have a case that says not that.

17          MR. PALMIERI:  I have plenty of cases which

18  define what a favorable termination and an unfavorable

19  termination is, all of which I've been arguing and I've

20  cited.

21          THE COURT:  Yes, and I've read them.

22          MR. PALMIERI:  This doesn't fall within the

23  favorable termination exemption.

24          THE COURT:  The reasons that are not indicative

25  of the defendant's innocence.  This nolle was entered for

1   reasons that are not indicative of the defendant's

2   innocence.  This is not a situation where the prosecutor

3   said, We don't think we can convict him, so we're going to

4   drop the charges.  We don't think the police officer is

5   going to show up to testify, so we're going to drop the

6   charges.

7               MR. PALMIERI:  What the prosecutor said was,

8   He's got bigger troubles somewhere else, I'm dropping the

9   charges.

10              THE COURT:  Correct.

11              MR. PALMIERI:  Which is absolutely indicative of

12  absolutely nothing other than the prosecutor is dropping

13  the charges.  It is not any kind of determination or

14  statement or assertion of the prosecutor's belief in his

15  ability to prove the guilt of the defendant in the

16  particular case that we're talking about, in his Milford

17  arrest, nor is it any statement opining the guilt of the

18  defendant.  In fact, there was no probable cause to arrest

19  him --

20              THE COURT:  Okay, we're going to turn to that

21  next --

22              MR. PALMIERI:  -- for --

23              THE COURT:  -- but the point is --

24              MR. PALMIERI:  I just wanted to make sure that

25  those two things are looked at together.

1          THE COURT:  -- the statement is not indicative

2   of the prosecutor's view that your client was innocent,

3   and that's the test.

4          MR. PALMIERI:  So I think that if Your Honor's

5   perspective was adopted, that every time a prosecutor

6   entered a nolle, they could say, "I think that I could

7   prove guilt or I feel that the evidence demonstrates

8   guilt, but we're entering a nolle anyway," and that would

9   foreclose civil rights plaintiffs from exercising their

10  federal and constitutional rights --

11         THE COURT:  Only --

12         MR. PALMIERI:  -- to sue for false arrest and

13  malicious prosecution.

14         THE COURT:  One, that's not what happened here;

15  and two, you're wrong.  What I'm suggesting is when a

16  prosecutor drops a charge in deference to a higher, more

17  serious charge, the dropping of the minor charge is not

18  indicative of innocence.  If there was --

19         MR. PALMIERI:  That's not what happened here.

20         THE COURT:  It is what happened here.

21         MR. PALMIERI:  He's out of state.

22         THE COURT:  He's facing felony charges in

23  Georgia, for which he later pled guilty.  Look, if --

24         MR. PALMIERI:  Which is irrelevant.

25         THE COURT:  -- your client were facing

1    manslaughter charges in New Haven, and his charge for

2    interfering with the morals of a minor were pending in

3    Bridgeport, and Bridgeport said, "Ahh, never mind, he's

4    got serious charges in New Haven," that's not suggesting

5    that he's innocent of the Bridgeport charges.  It's just

6    saying he's got bigger problems.

7            MR. PALMIERI:  But I think you're ignoring *Spak*,

8    and *Spak* says --

9            THE COURT:  I'm relying on *Spak*.  Let me be

10   completely clear.  I am relying entirely on *Spak*, period,

11   because *Spa*k says that a nolle does not constitute a

12   favorable termination decision when it is entered for

13   reasons that are not indicative of a defendant's

14   innocence, unquote.

15           MR. PALMIERI:  But there's more to that quote.

16           THE COURT:  857 F.3d at 464.  So let me just be

17   very clear; we can disagree about what *Spak* means, but

18   that is precisely the case that I'm relying on.

19           MR. PALMIERI:  And the next line is:  However,

20   this qualifier is defined narrowly, as I've read and have

21   briefed and won't repeat.

22           THE COURT:  This is a very narrow application.

23   Why?  Because when --

24           MR. PALMIERI:  Just to add Kramer specifically?

25           THE COURT:  No, of course not, to add anybody

1  who has more serious charges pending and the lower charges

2  are dropped in deference to the fact that this person is

3  being prosecuted on much more serious charges.  If we have

4  a system that allows every little arrest to be prosecuted

5  as a false arrest when the person had prosecutions

6  deferred because they had more serious charges, then we

7  are going to either be very busy on the civil side or

8  we're going to be very busy trying meaningless cases after

9  people are released from their felony convictions.

10          MR. PALMIERI:  Judge, you perceive being taken

11  from a motel room by a SWAT team under these

12  circumstances --

13          THE COURT:  What were his charges?

14          MR. PALMIERI:  -- arrested for risk of injury, a

15  felony charge in Connecticut, to be a little arrest?

16          THE COURT:  I think that was a little arrest.

17          MR. PALMIERI:  That was a little arrest?

18          THE COURT:  Right.  He's got bigger problems.

19  In Georgia he was charged with not just touching but

20  having oral sex with a minor.  That's a more serious

21  charge.

22          MR. PALMIERI:  If you're familiar with risk of

23  injury, it would include sexual assault on a child.

24          THE COURT:  It could, it could, but he didn't --

25          MR. PALMIERI:  It sure could.

1              THE COURT:  He didn't have --

2              MR. PALMIERI:  It's a ten-year felony under

3    Connecticut state law, in case the Court is unaware.

4              THE COURT:  Okay.  Well, we can dispute which

5    one is the more serious.  I tend to think that a charge

6    that there's been actual sexual assault on a child is a

7    more serious charge than being in a motel room with

8    someone who's 14 years old.

9              MR. PALMIERI:  And I think --

10             THE COURT:  Let me hear from the defense.  You

11   and I are going around and around.  Let me hear from the

12   defense.

13             MR. ALLEN:  Thank you, Your Honor.  Just a few

14   points based on the discussion.

15             I would just point the Court, although *Spak* does

16   discuss the substantive favorable termination element on a

17   malicious prosecution claim in what I call dicta, Spak is

18   really about accrual, a totally different issue that's not

19   before the Court.  I would direct Your Honor to *Roberts v.*

20   *Babkiewicz*, a Second Circuit decision of 2009, 582 F.3d

21   418 at 422, which there are a bunch of sentences which

22   kind of define favorable termination.  But in *Roberts* it

23   states that a nolle may qualify for a substantive

24   favorable termination if it's entered by the prosecuting

25   authority based on plaintiff's innocence and not because

1    of a negotiated plea or other consideration.

2           "Or other consideration" is somewhat of a

3    catch-all phrase that directly applies here.  We haven't

4    even talked about the transcript of this disposition

5    hearing at which the nolle was entered.  It could not be

6    clearer.  It's crystal clear why that nolle was entered.

7           And I would point out the burden is not on the

8    prosecutor here to preserve or preclude a malicious

9    prosecution claim down the road.  Mr. Kramer had counsel

10   at this hearing.  Nowhere, at no point -- first of all,

11   Mr. Kramer's counsel is the first attorney to speak on the

12   record and explains to the Court that Mr. Kramer is not

13   present because he's in Georgia awaiting trial on what the

14   prosecutor would later refer to as serious charges there.

15   He could have preserved any kind of record or, you know,

16   he didn't even have to agree to the entry of a nolle.

17   There's got to be a burden on, at this stage, a criminal

18   defendant, but ultimately the plaintiff in a malicious

19   prosecution case, to make clear at the time that the nolle

20   is entered that it will meet the standard announced in

21   *Roberts* and also initially announced in *See v. Gosselin*

22   under Connecticut law.

23          Clearly the nolle was entered here due to an

24   other consideration, that consideration being the fact

25   that Edward Kramer had already been extradited.  He was

1    arrested pursuant to a governor's warrant.  He was

2    extradited to Georgia.  He was facing serious felony

3    charges stemming from accusations of, as Your Honor said,

4    sexual assault against multiple minors.  And, again, it

5    was his doing to prolong that prosecution and his decision

6    not to -- whether he was able to stand trial or not, he

7    was obviously able to go to this movie set and walk

8    around.  It was his decision to prolong the period of time

9    under which he would be confined by the prohibitions

10   instated by the court of Georgia, including that

11   prohibition that prohibited him from being alone with

12   anyone under the age of 16.

13          THE COURT:  Or for being in the state of

14   Connecticut.

15          MR. ALLEN:  Correct, or for being in the state

16   of Connecticut.  This entire situation was of Mr. Kramer's

17   making, and the fact that he can't meet this favorable

18   termination element is also of Mr. Kramer's making and his

19   counsel's making at this hearing.  The record is the

20   record.  I think, as Your Honor seems to at least be

21   considering, if not persuaded, plaintiff cannot meet this

22   element on this record.

23          And that's all I would say for now.  Thank you,

24   Your Honor.

25          THE COURT:  Thank you.  Let me ask what I hope

1    is a quick question about malice.  Is it the plaintiff's

2    position that malice is shown by the lack of probable

3    cause, but there's no other evidence of malice?  Is that

4    right?

5                MR. PALMIERI:  No, that's not the exclusive

6    basis.

7                THE COURT:  Okay, so what else do you have?

8                MR. PALMIERI:  The manner in which the arrest

9    was executed, which was the entry of the SWAT team into

10   the --

11               THE COURT:  What's the connection between the

12   two named defendants and the SWAT team?

13               MR. PALMIERI:  They're named on the warrant, and

14   they're named as one of the -- one of the two defendants,

15   I think it's Staurovsky, is named as being present at the

16   arrest, if I'm not mistaken.

17               THE COURT:  Did they order the SWAT team?

18               MR. PALMIERI:  I don't recall.  My recollection

19   is that they had -- they had arranged the arrest in this

20   manner, but I'm not certain on that.

21               THE COURT:  I don't recall any evidence that

22   they were involved in any aspect of the manner of the

23   arrest; and that, as you noted, one of them was not even

24   present at the arrest.

25               MR. PALMIERI:  Vitti was not, that's correct.

1   Staurovsky was.

2           THE COURT:  Right.  Presence isn't enough.

3           MR. PALMIERI:  I can move to another --

4           THE COURT:  Let's get to the probable cause --

5           MR. PALMIERI:  No, as far as malice, I have two

6   other issues.

7           THE COURT:  All right.  What else do you have?

8           MR. PALMIERI:  The third point is that the

9   manner in which the alleged victim, and we've presented

10  evidence in our objection in the form of a statement from

11  Trevor T. -- who was a minor at the time, he's not a minor

12  now -- and he contemporaneously kept notes that he was

13  detained for six hours and was mistreated by the

14  defendants in an effort to elicit incriminating evidence

15  against Edward Kramer.  And that is clearly indicative of

16  malice.  They've gone beyond merely arresting or asking

17  for, participating in the arrest.

18          THE COURT:  They're actually investigating it?

19          MR. PALMIERI:  They're holding an alleged victim

20  for six hours and grilling the alleged victim.

21          THE COURT:  Was there evidence that he sought to

22  terminate that interview?

23          MR. PALMIERI:  He was 14 years old.

24          THE COURT:  Is there evidence that he sought to

25  terminate the interview?

```
 1              MR. PALMIERI:  In his writing he said that he

 2   was angry and upset and wanted to leave.

 3              THE COURT:  Right.

 4              MR. PALMIERI:  And that he asked for food and --

 5              THE COURT:  Did he ask to leave?  Did he ask to

 6   terminate the interview?

 7              MR. PALMIERI:  He's 14.

 8              THE COURT:  I understand how old he is.  Did he

 9   ask to terminate the interview?

10              MR. PALMIERI:  I --

11              THE COURT:  I don't think so.

12              MR. PALMIERI:  -- don't recall if he

13   specifically did or not.

14              THE COURT:  So how is it that he was detained?

15   If he was free to go, how is it -- he wasn't in handcuffs

16   during the interview.

17              MR. PALMIERI:  As I said, he's a 14-year-old.  I

18   have a 13- and a 15-year-old.  You can ask them if a

19   police officer put them in a room and asked them questions

20   for six hours --

21              THE COURT:  Now you're expanding the record.

22   The record is --

23              MR. PALMIERI:  -- whether they knew they could

24   simply get up and leave because they have Sixth Amendment

25   right -- maybe my kids might know that, but I don't think
```

1    an average 14 --

2            THE COURT:  All right.  Whatever you might

3    think, there's nothing in the record to suggest that this

4    was anything other than an interview that he did not ask

5    to terminate.

6            MR. PALMIERI:  Finally, Mr. Kramer indicated

7    that he had -- and he states this in his deposition

8    testimony and his interrogatories under oath -- that he

9    had actual evidence with him in a bag that was seized by

10   the police, including Staurovsky and Vitti who were

11   questioning him, that showed that he -- the bond

12   conditions had changed and he was able to be outside of

13   the -- in the state of Connecticut, and they refused to

14   look at that, saying that it's in evidence, and we can't

15   get to it, and giving him the run-around, mumbo-jumbo.

16   So --

17           THE COURT:  Was he arrested at the motel for

18   violation of the terms of his release, or was he arrested

19   for --

20           MR. PALMIERI:  No.  He was arrested for alleged,

21   baseless, risk of injury.

22           THE COURT:  Risk of injury.  So how would the

23   terms of his release bear on whether or not he committed

24   risk of injury?

25           MR. PALMIERI:  Because the reason that he was

1    arrested was that the prosecutor -- and this is from the

2    record -- the prosecutor from Georgia, Daniel Porter,

3    contacted the state's attorney in the state of Connecticut

4    in Milford and said, Arrest him because he's not supposed

5    to be in Connecticut, and he's not supposed to be around

6    14-year-old boys.

7            THE COURT:  But that's not why -- he was

8    arrested because there were two sworn witnesses about his

9    interactions with the 14-year-old.

10           MR. PALMIERI:  Who said that there was

11   absolutely nothing wrong.  And then when they asked the

12   14-year-old, "Is everything okay," repeatedly he said

13   "yes."  And then when one of the sworn witnesses asked the

14   14-year-old whether there was any problem, outside of the

15   hearing and sight of Mr. Kramer, that he said, no, it was

16   fine; goodbye.  So the sworn witnesses would support that

17   there was no probable cause.

18           THE COURT:  So let me just get this straight.

19   There's no probable cause to arrest somebody, who has

20   pending child molestation charges, for being in a hotel

21   room with an unaccompanied minor who is wearing a towel.

22   There's no probable cause to believe that he's engaged in

23   conduct that endangers a minor?

24           MR. PALMIERI:  And taking those facts out of

25   context and without the other facts that these officers

1    knew is not fair.

2            THE COURT:  But when you say --

3            MR. PALMIERI:  They also knew that people who

4    saw them and questioned the child and observed the

5    interaction saw that there was nothing wrong.  There was

6    no contact between the two.  Mr. Kramer was dressed, and

7    he was working on a computer or sitting in a different

8    part of the room, and then the 14-year-old was coming out

9    of the shower.

10           THE COURT:  Yeah.  Put all of that into an

11   affidavit, and there's still probable cause to arrest.

12           MR. PALMIERI:  They also knew -- they knew

13   before they arrested that he was the guardian of this

14   14-year-old, and that the mother of the 14-year-old and

15   the 14-year-old and Mr. Kramer lived together in New York

16   for months.

17           THE COURT:  I didn't see paperwork appointing

18   him the guardian.  Did I miss that?

19           MR. PALMIERI:  There's not a guardianship

20   paperwork in there.  There's reference to the guardianship

21   paperwork including that under oath Mr. Kramer said that

22   he gave it -- it was SAG, Screen Actors Guild, required

23   information that he gave to the persons involved with the

24   movie prior, and that that was available, and that when

25   Christy T. was questioned prior to the arrest, she said,

1    Yeah, he's -- you know, we live with him, and he's the

2    guardian of my son.

3               THE COURT:  Right, but --

4               MR. PALMIERI:  They knew that.

5               THE COURT:  Which court was it that appointed

6    him guardian?  I forget.

7               MR. PALMIERI:  I think it was the New York

8    court.  I'm not sure.  The point is that the mother of the

9    child told the police officers, prior to the arrest, that

10   we live with him and he's the guardian of my son, even if

11   there is no guardianship paper.

12              THE COURT:  Well, saying you're a guardian and

13   being a guardian are two different things.

14              MR. PALMIERI:  Well, that's the mother saying

15   it.  I mean, you're saying the police don't have the right

16   to rely on the mother's testimony?  They sure did rely on

17   it for other things.

18              THE COURT:  They can rely on whatever they find

19   to be reliable.

20              MR. PALMIERI:  Judge, I know that you want to

21   see this case go down, but we've got to at least play by

22   the rules.

23              THE COURT:  Let's just be very clear about how

24   biased I am.  For whatever reason, who knows, maybe I

25   don't like you, maybe I don't like your client, maybe I

1   don't like these kind of cases.  There's probably all

2   kinds of reasons why I'm biased here.  What are you

3   talking about?

4            MR. PALMIERI:  Well, I mean, if that's the

5   case --

6            THE COURT:  What are you talking about, sir?

7            MR. PALMIERI:  -- if you don't like me, my

8   client or --

9            THE COURT:  You're suggesting --

10           MR. PALMIERI:  -- these cases, then you can

11   recuse yourself.

12           THE COURT:  You're suggesting -- you've made a

13   public accusation now that I want this case to go down.

14   What is it that you believe suggests I want this case to

15   go down, rather than wanting to do the right thing?

16           MR. PALMIERI:  Okay.  Well, first, as far as

17   the -- as far as the favorable resolution, Your Honor, you

18   know, is indicating that you want to see the law extended

19   to cover this case.  And if that's based on concern about

20   this particular type of case, then I'd just ask that you

21   take a step back and look at, you know, look at the facts

22   that are in this case because I think that Mr. Kramer

23   deserves a fair hearing.

24           THE COURT:  Mr. Kramer is getting a fair

25   hearing.  Be careful about casual allegations of bias.

1          MR. PALMIERI:  It was not intended as an

2    allegation, and I apologize if it came across that way.

3    I'm fully -- I will argue till my last breath; but I do

4    not make spurious allegations, Your Honor, so please

5    forgive me.

6          THE COURT:  So getting back to the probable

7    cause issue, the officers arrive at the motel.  They find

8    a person, who has pending child molestation charges

9    against him, in the presence of a minor who's wearing only

10   a towel.  What is it, again, that suggests that there's no

11   probable cause that he's engaged in conduct that

12   constitutes a risk to a minor?  Whatever else people may

13   say about --

14         MR. PALMIERI:  Okay, understand the question.

15   (A) Those are allegations.  They're claims that were as

16   yet unproven or undemonstrated that had been from ten

17   years prior.  (B) I, as a parent, can think of innumerable

18   reasons that a guardian of a child would be around a child

19   who just got out of the shower and was wearing a towel

20   that are in no way indicative of anything nefarious.  And

21   (C), The actual information that they had from the mother

22   of the child and from witnesses who were third-party

23   witnesses to what -- to Mr. Kramer being in a motel room

24   with his 14-year-old guardian -- you know, child he has

25   guardianship over, said there was nothing wrong.

1          THE COURT:  Let me just be clear.

2          MR. PALMIERI:  So what they then act on --

3    Judge, if I may, this issue of bias has come up, so

4    there's bias all over the case as far as the folks that

5    heard this stuff.  You know, saying "child molester" to

6    somebody, there's rarely anything, there's nothing that I

7    can think of that's more bias-inducing, that's more

8    panic-inducing than saying, you know, "A child molester is

9    coming to our area."  And the area in this case was the

10   scene of a movie that was filmed with children, for

11   children, you know, by adults who were -- you know, had

12   child actors around, so merely saying this kind of thing

13   was enough to raise the panic of everyone, and they acted

14   out of this panic.

15          But when we step back from the panic and we

16   don't look at this with a pre -- bear in mind, these

17   people, when they heard all this information, only knew --

18   and the facts were that Mr. Kramer was only accused at

19   that time.  So when they looked at it, they had an accused

20   person, who has the right to be presumed innocent, and

21   what they did was they took all sorts of steps to call

22   people in Florida, from Connecticut, who then called a

23   Georgia prosecutor, who then called a Connecticut

24   prosecutor, who then said, Oh, yeah, he's this, that and

25   the other, and we want him back here in Florida -- in

1    Georgia, and that's what happened.

2              THE COURT:  Well, okay.  But --

3              MR. PALMIERI:  Because of the allegation.  That

4    does not make probable cause, Judge, and we have to be

5    very careful to sort out --

6              THE COURT:  Let me try to sort it out then.  So

7    Kramer -- the police knew Kramer was facing multiple child

8    molestation charges.  They're only charges, which means

9    there's only probable cause, but he's got those charges

10   pending in Georgia; that as a result of those charges, he

11   was under a court order not to have any unsupervised

12   contact with someone under the age of 16.  He was with

13   somebody who was 14.  He was in a hotel room with that

14   14-year-old, and two witnesses had provided sworn

15   statements saying that he was acting creepy and weird

16   toward the child.

17             Now, what is it about those facts, which I don't

18   think are disputed, that don't give rise to probable cause

19   to arrest him for endangering the morals of a child?

20             MR. PALMIERI:  He was around a kid who he has

21   guardianship of and somebody who --

22             THE COURT:  Was there an exception, by the way,

23   in the court order for someone who he is, quote unquote,

24   guardian over?

25             MR. PALMIERI:  This is not a case that he was in

1    violation of a court order.  He was arrested for risk of

2    injury.  Risk of injury has very specific --

3              THE COURT:  Right, but they knew --

4              MR. PALMIERI:  -- claim.

5              THE COURT:  They knew and could rely upon the

6    court order that says he's not permitted to be in a room

7    unaccompanied with someone who's under 16.  And he's in a

8    hotel room, motel room, with such a person.  And, by the

9    way, I still don't accept that there's evidence that he's

10   the guardian.  The mother called him that, but he's not

11   been appointed guardian, has he?

12             MR. PALMIERI:  He asserted that he has been,

13   that he had guardianship papers.

14             THE COURT:  Do you have the papers?

15             MR. PALMIERI:  I don't have them, no.

16             THE COURT:  No.  I haven't seen any papers.

17             MR. PALMIERI:  You know, that's as may be, but

18   the question is whether the elements of risk of injury

19   were present, and they're not.  The risk of injury is not

20   met by having him in a motel room with a 14-year-old with

21   no further conduct.  There's no touching.  In fact, there

22   are witnesses who say that there is nothing wrong here.

23   So there's no probable cause to arrest.

24             If they thought that they had -- this, I think,

25   this speaks both absence of probable cause and malice --

```
 1    if they thought that they had an issue of a violation of a

 2    court order from Georgia, why wouldn't they just arrest

 3    him for violating the terms and conditions of his release?

 4    I mean, they didn't do that.  They went after him with

 5    this much more serious charge.

 6              THE COURT:  53-21a says:  Any person who (1)

 7    willfully or unlawfully causes or permits any child under

 8    the age of 16 years to be placed in such a situation that

 9    the morals of such a child are likely to be impaired shall

10    be guilty of a felony.

11              MR. PALMIERI:  I --

12              THE COURT:  So he's under 16.  He's in a motel

13    room with an adult, half-dressed.

14              MR. PALMIERI:  I know the elements of the

15    charge.  I've litigated them in Connecticut criminal state

16    courts, criminal matters --

17              THE COURT:  Right.

18              MR. PALMIERI:  -- and this doesn't meet it.

19    There's no morals being impaired here by the fact that,

20    even if he were not supposed to be in a room with a child,

21    that the child's morals are not being impaired.

22              THE COURT:  Morals are -- they have to be likely

23    to be impaired. So...

24              MR. PALMIERI:  But there has to be some kind of

25    substantial or overt evidence that this is the case.  Mere
```

1    presence, I mean, he could be simply walking into a

2    grocery store, under this analysis he could be arrested

3    for risk of injury, and that's not the case.  He might be

4    arrested for violation of terms of bond of a release if

5    that release were active, if those conditions said you

6    can't be around a 14-year-old, but that's not what we have

7    here.  What we have here is a risk of injury charge, which

8    has very specific meaning under Connecticut state law that

9    this doesn't meet.

10              THE COURT:  Okay.

11              MR. ALLEN:  Can I chime in a little bit --

12              THE COURT:  Sure.

13              MR. ALLEN:  -- Your Honor?  Just to go back, the

14    notion that -- there is no dispute that he was found in

15    violation of that Georgia court order.  Obviously,

16    Mr. Kramer was either misinformed or lied in his

17    deposition, and then after he was arrested about the

18    validity of that order, but as noted by the Appellate

19    Court of Connecticut and demonstrated by the Georgia court

20    after the arrest, that order was in effect.  That's the

21    reason he was -- his violation of that order is the reason

22    that his bond was revoked and he was returned to Georgia,

23    a state where the court system had already determined that

24    he presented an inherent risk of impairing the morals of

25    someone under the age of 16 and therefore could, under no

1   circumstances, be in the unsupervised presence of anyone

2   age of 16, guardianship or not.

3          I would point out that obviously there's no

4   documentation in the record about guardianship.  That term

5   is thrown around loosey-goosey by Mr. Kramer in his

6   deposition, but not once has he produced a document to

7   back it up.

8          The same with his testimony and apparent pleas

9   to Detective Vitti that he has some court paperwork that

10  superseded the order in place.  A copy of that paperwork

11  would be easy enough to obtain at any point in time,

12  including today, if it existed; but the fact is it didn't

13  and it doesn't.

14         When you add there is (a) just the mere clear

15  violation of that prohibition in the order, along with the

16  sworn statements of two witnesses who did not swear to

17  information from which one would surmise that they thought

18  nothing was wrong, quite the opposite.  They recount

19  taking affirmative steps to intercede and prevent

20  Mr. Kramer from going into a room where they knew the boy

21  was going to change his underwear.  If you read those

22  statements and you know the background, which is confirmed

23  as true as far as the pending charges, the order in place,

24  which he indisputably violated, all of that information,

25  if that doesn't present probable cause -- and again, this

1    is not -- you don't need information which rises to the

2    level of conviction, this is a probable cause analysis --

3    if that information collectively doesn't give rise to

4    probable cause for a risk of injury charge, I'm not

5    certain what does.

6           Earlier Attorney Palmieri mentioned that the

7    police had somehow spoken to the mother of the boy before

8    the arrest.  That's patently incorrect.  The record

9    demonstrates, if you look at Defendants' Exhibit B, which

10   is Detective Vitti's supplemental case reports, the

11   accuracy of which he has sworn to in his affidavit, which

12   is Exhibit A, the timeline of events is laid out crystal

13   clear in there.  There's no contact whatsoever with the

14   mother until post-arrest, just like there's no contact by

15   detective -- between Detective Vitti and the boy, or

16   Detective Staurovsky and the boy until post-arrest.

17   Neither of them are present at the arrest.  The folks who

18   are present at the arrest are listed, name by name, in the

19   same incident report.  They do not include either

20   defendant.

21          The only information to be gleaned in this

22   post-arrest, but to the extent that plaintiff argues that

23   my clients did anything post-arrest to further the

24   prosecution of the charge nolled because Mr. Kramer had

25   already been extradited, the only thing gleaned,

1   information gleaned from discussions with the boy and the

2   mother is the fact that both of them had been duped by

3   Kramer, who apparently didn't think it was important to

4   let them know that, at least as far as the State of

5   Georgia was concerned, he's not allowed to be alone with

6   the boy, or any boy, or any girl under the age of 16.

7   They had no knowledge of either the pending charges or the

8   order and restrictions under which he was released on

9   bond, many of which he violated.

10         Setting apart the fact that he's alone with the

11   boy, he's not supposed to be in Connecticut.  He's not

12   reporting to the district attorney in Georgia, who goes

13   out of his way, comes all the way up to Connecticut to

14   testify in the habeas matter because the State of Georgia

15   was pretty serious about prosecuting these charges if and

16   when plaintiff was done giving them the runaround as far

17   as medical health issues.

18         Quite frankly, the record leaves no dispute

19   about what information was known and not known by my

20   clients at the time of the arrest and at any time, and

21   those facts together gave rise for them to have probable

22   cause to believe that Mr. Kramer unlawfully, which is

23   given, he was unlawfully in the presence -- unsupervised

24   presence of this boy, permitting the boy under the age of

25   16 years to be placed in a situation where his morals are

1   likely to be impaired.

2          I just -- everything they did, whether it's

3   relevant or not, their concerns were subsequently

4   validated by Mr. Kramer's ultimate guilty plea in the

5   Georgia matter.  He should not have been in that hotel

6   room alone with the boy, and the fact that they intervened

7   based on the information they know was completely

8   reasonable and, at a minimum, objectively reasonable, and

9   entitles them to qualified immunity.

10          Sorry to speak so quickly.

11          THE COURT:  Well, we've been going for an hour,

12   so let me understand if either of you want to make any

13   further argument on the motion or in opposition to the

14   motion.

15          MR. ALLEN:  Not unless the Court has any

16   questions.

17          MR. PALMIERI:  Any questions for the plaintiff,

18   Your Honor?

19          THE COURT:  No.  I've asked my questions.

20          MR. PALMIERI:  Okay.  Thank you for allowing me

21   to argue zealously.

22          THE COURT:  Oh, sure.

23          MR. PALMIERI:  And I would be sorry if you

24   didn't like me, but hopefully you don't conflate my

25   clients and my advocacy with me personally.  But thank

1    you, Judge.

2              THE COURT:  I'm happy to have a vigorous

3    advocate, better that than a quiet one.  But I am going to

4    rule at this time, and I am going to grant the motion for

5    summary judgment.

6              In my view, the malicious prosecution claim

7    fails on any number of grounds; and, in addition, if I'm

8    wrong about that, the defendants are entitled to qualified

9    immunity.

10             I think of the four elements of a malicious

11   prosecution case in either state or federal law, we can

12   agree that the defendants here initiated or procured

13   criminal proceedings against the plaintiff within the

14   meaning of the law, so that element is established; but

15   the other elements, in my view, there's insufficient

16   evidence for a reasonable jury to find in favor of the

17   plaintiff even looking at the record in the light most

18   favorable to the plaintiff.

19             The termination, favorable termination prong is

20   a close call.  I don't have a case exactly on point, but,

21   in my view, the favorable termination requirement cannot

22   be met, as a matter of law, cannot be met when the

23   prosecution is terminated in order to avoid an unnecessary

24   duplicative prosecution and the deference is made to a

25   more serious prosecution pending elsewhere.  That was the

1   situation here.  That's exactly what the prosecutor said

2   on the record.  There's no reason to disbelieve that, and

3   it's the plaintiff's burden to come forward with evidence

4   that the proceedings terminated in his favor, in my view,

5   because the only evidence in the record about the reason

6   for the termination was deference to a more serious

7   prosecution.  That cannot, as a public policy matter,

8   constitute favorable termination or we're going to have

9   serious problems in both the civil and criminal arenas

10  moving forward.

11          So I find as a matter of law that the nolle in

12  this case did not constitute a favorable termination.

13  Even if I'm wrong about that, there was certainly

14  sufficient probable cause to arrest Mr. Kramer for the

15  violation of 53-21a, risk of injury under Connecticut law.

16  If he did willfully or unlawfully cause or permit a child

17  under the age of 16 to be placed in a situation where the

18  morals of such a child are likely to be impaired, or at

19  least there was probable cause to believe that he had done

20  so, this would include the knowledge the officers had that

21  he was facing multiple child molestation charges in

22  Georgia, that he was, as a result of those charges,

23  prohibited from having any unsupervised contact with

24  children under the age of 16, that he violated that

25  condition by being in a hotel room with a 14-year-old, and

1   that witnesses had informed the police that he was acting

2   in a creepy and weird manner toward the child and that

3   they were uncomfortable about what was going on.  I don't

4   believe there's any dispute that they had information that

5   he was -- he, Mr. Kramer -- was in the hotel room with the

6   child, who was dressed only in a towel.

7          And under all those circumstances, where he's

8   not permitted by law to be in a room with someone under

9   16, it seems to me that the risk here becomes obvious, and

10  the probable cause, therefore, becomes obvious as well.

11  So I find that the arrest was made with probable cause or

12  certainly there's not sufficient evidence for a jury to

13  find otherwise.

14          And, finally, that the defendants acted with

15  malice, the principal potential basis for malice is the

16  absence of probable cause.  That doesn't exist, and in my

17  view the other suggestions as a basis why these two

18  officers had any malice against Mr. Kramer just don't

19  carry any weight.  The SWAT-style arrest that's been

20  alleged cannot be attributed to these two officers, and

21  there's nothing to suggest that they had any reason to

22  have malice toward Mr. Kramer; but, rather, they were

23  seeking to bring an offender to justice.

24          So, in my view, three of the four elements are

25  not supported by sufficient evidence to permit a jury to

1   find in favor of the plaintiff.  If I'm wrong about all of

2   that, it seems to me that there is certainly qualified

3   immunity here, and these officers acted in an objectively

4   reasonable way, and certainly reasonable officers could

5   disagree about whether there was probable cause to arrest

6   for risk of injury, and it seems to me that under those

7   circumstances the conduct here is protected by qualified

8   immunity.

9        The last thing I'll mention about the probable

10  cause standard is that I do not find that the information

11  that was obtained by the officers after the arrest was

12  sufficiently exculpatory to eliminate the existence of

13  probable cause for the arrest; that is, the information

14  that they obtained after the fact was partly supportive

15  and partly not supportive of the probable cause to arrest

16  and was not sufficiently exculpatory to vitiate the

17  probable cause to arrest at the time of the arrest.

18        So I don't intend to write on this issue, but

19  I'd be happy to try to clarify or amplify this ruling at

20  this time if either of you find that important.

21        MR. ALLEN:  Not for the defendants, Your Honor.

22        MR. PALMIERI:  I don't think so, Judge.  Thank

23  you.

24        THE COURT:  All right, thank you both.  We will

25  stand in recess.

1              MR. ALLEN:   Thank you.

2                (Proceedings adjourned at 3:06 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

No. 3:15-cv-01230(SRU)
Edward Kramer v. Antonio Vitti, et al


        I, Sharon L. Masse, RMR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



            November 18, 2017


            /S/ Sharon L. Masse
         Sharon L. Masse, RMR, CRR
          Official Court Reporter
          915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (860)937-4177